National Ice and Cold Storage Company of California v. Commissioner.
National Ice & Cold Storage Co. v. Commissioner
Docket No. 7318.
United States Tax Court
1947 Tax Ct. Memo LEXIS 321; 6 T.C.M. (CCH) 80; T.C.M. (RIA) 47019; January 31, 1947
Valentine Brookes, Esq., and Arthur H. Kent, Esq., 1720 Mills Tower, San Francisco 4, Calif., for the petitioner. W. J. McFarland, Esq., for the respondent. MURDOCK Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency of $19,762.18 in the income tax of the petitioner for the calendar year 1940. The issues for decision are: (1) whether the petitioner's basis for loss on four mountain properties was $120,193.62 or a much smaller amount; (2) whether the petitioner realized income of $100,800 from a transaction in which it, inter alia, settled *322 a debt of $224,000 by the payment of $123,200, and (3) whether the petitioner is entitled to a deduction as taxes or rent for $2,252.90 paid as taxes on a leased property which it purchased during the taxable year. Findings of Fact The petitioner, a California corporation, filed its return for 1940 with the collector of internal revenue for the first district of California. It kept its books and filed its return on an accrual basis. The petitioner was organized for the purpose of acquiring the business and properties of The National Ice and Cold Storage Company (hereinafter called the old company). The petitioner, on February 1, 1913, issued $15,000,000 par value of its common stock and its bonds in the face amount of $3,530,000, in exchange for all of the assets and business of the old company. The assets included a mountain property called Iceland, then in use for the cutting of natural ice, all of the capital stock of a company owning a similar property known herein as Tahoe, 78 1/3 per cent of the capital stock of another company owning a similar property known herein as Floriston, and 66 2/3 per cent of a third company owning a similar property known herein as Mountain. *323 The Tahoe property was conveyed to the petitioner on May 23, 1913 in exchange for a note of the petitioner in the amount of $80,000. The note was returned to the petitioner on March 8, 1915, the Tahoe stock was cancelled, and Tahoe was dissolved at that time. The Floriston property was conveyed to the petitioner on May 13, 1913 in exchange for a note of the petitioner in the amount of $36,000. The petitioner later acquired the remaining stock of Floriston for $7,500 per value of the petitioner's preferred stock and $250 in cash. Floriston was dissolved on March 8, 1915 at which time the petitioner received its note for $36,000 and surrendered all of the Floriston stock for cancellation. The Mountain property was conveyed to the petitioner on May 13, 1913 in exchange for a note of the petitioner in the amount of $44,000. The petitioner later acquired the remaining stock of Mountain for $14,000 par value of the preferred stock of the petitioner and $250 in cash. Mountain was dissolved on March 8, 1915 at which time the petitioner received its note for $44,000 and surrendered all of the Mountain stock for cancellation. The petitioner abandoned the improvements on the four properties *324 and sold a small part of the land prior to 1940. It sold the remainder of the land in 1940 for $2,045.94. The petitioner claimed a deduction for 1940 of a long-term capital loss of $118,147.68 ($120,193.62, basis, less $2,045.94, amount realized). The Commissioner held that the basis (cost) of the land sold was $19,102.25 and computed a long-term capital loss of $17,056.31 and disallowed the additional $101,091.37 claimed by the petitioner. The basis (cost) to the petitioner of the land sold in 1940 was $120,193.62. James Shewan was a minority stockholder of the petitioner. He acquired land adjoining an ice manufacturing plant of the petitioner in Oakland, California, and erected a cold storage building thereon to be operated by the petitioner in conjunction with its ice plant. He leased his property to the petitioner. This occurred about 1922. The cost of the property was over $300,000. The lease provided that the petitioner could purchase the property at cost at the end of each five-year period. The lease was to continue for twenty years if no purchase was made. Shewan died in December, 1926. The petitioner borrowed $550,000 from Shewan. It still owed his estate $224,000 in *325 1932 at which time its bonded indebtedness amounted to $3,440,115. The annual rental on the Shewan property at that time amounted to $31,643.83. The petitioner was unable to meet certain requirements in connection with its indebtedness. The stockholders at that time entered into a voting trust agreement vesting control of the petitioner in the creditors represented by seven directors, one of whom was named by the Shewan estate. The creditors agreed to postpone certain interest payments until 1942. It soon became apparent that the petitioner needed additional forbearance if it was to avoid bankruptcy. The creditors entered into an agreement with the petitioner in 1935 continuing the voting trust agreement for five years, waiving the postponed interest payments, reducing the current interest rate, and waiving the amortization fund requirements. The Shewan estate amended the lease to the petitioner to reduce the rent to $12,000 a year and to have the lease expire on June 1, 1950, but continuing the other provisions of the lease. An appraiser valued the leased property for the Shewan estate at that time at $181,046.17. The petitioner made no payments on the Shewan indebtedness from 1933 *326 to 1939. The petitioner owed the Shewan estate on January 1, 1940, $224,000. The estate owned 5,857 shares of common stock and 909 shares of preferred stock of the petitioner at that time. The sole surviving trustee of the Shewan estate was much concerned about the financial condition of the petitioner and the effect upon the Shewan estate of various possible moves by the creditors of the petitioner. He felt that there was danger of loss to the estate should the petitioner for any reason cease to lease the cold storage property. He entered into negotiations with the petitioner which resulted in an agreement dated January 2, 1940. He petitioned the Surrogate Court of the State of New York for instructions and for leave to enter into the agreement. The agreement was approved by the Surrogates Court on January 26, 1940 and by the required number of bondholders of the petitioner on April 29, 1940. The agreement provided: (1) that the indebtedness of $224,000 due to the Shewan estate from the petitioner was to be satisfied by the petitioner paying to the estate $123,200, together with interest on $224,000, from December 1, 1939 to the date of the payment of $123,200; (2) the Sewan estate *327 was to surrender to the petitioner for cancellation all of the shares of common and preferred stock in the petitioner owned by the estate; (3) the Shewan estate agreed to sell to the petitioner and the petitioner agreed to purchase the cold storage property in Oakland for $125,000 payable $12,500 at the time of the execution of the agreement and the balance in 18 quarterly installments of $6,250 each evidenced by notes dated January 2, 1940 and bearing interest from that date at the rate of 5 per cent secured by a purchase money mortgage on the property. The agreement further provided that the Shewan estate was to apply to the Surrogates Court for authority to carry out the agreement. The petitioner was to obtain the consent of the owners of 60 per cent of the face amount of its bonds outstanding. Each party was to be placed in its former status as if the agreement had never been made in case either party was unable to obtain the necessary authority to carry out the agreement. The agreement further provided that any payment of rent made by the petitioner to the Shewan estate on or after January 2, 1940 (and prior to the execution of the agreement) should be credited on account *328 of the initial payment of $12,500 referred to in the agreement, and that after the execution of the agreement and until performance thereunder or termination thereof the petitioner should not be required to pay any rental. But the petitioner was required, however, to pay all taxes on the real property which it was obligated to pay under the existing agreements and leases. The agreement was also conditioned upon satisfactory title examination of the property involved. The Oakland property was transferred to the petitioner by deed on July 24, 1940, at which time the petitioner executed notes for the unpaid balance of the purchase price. The petitioner paid to the Shewan estate $123,200 prior to December 31, 1940 in satisfaction of the debt of $224,000 mentioned above, and the Shewan estate surrendered to the petitioner all of its stock in the petitioner prior to the end of 1940. The lease between the petitioner and the Shewan estate, which was in effect at all times material hereto until the Oakland property was acquired by the petitioner, contained a provision that the petitioner was to pay all taxes on the land and buildings. The petitioner paid $2,252.90 on April 20, 1940 as *329 the April installment of current city and county taxes on the Oakland land and cold storage plant. These taxes had been assessed and had become a lien on the property in 1939. They represented the taxes for the period January 1, 1940 through June 30, 1940, being the second one-half of the tax year 1939 to 1940. The notice of deficiency contains the following paragraph: It is held that the amount of $100,800.00 included in the item of other income as reported on your return for the year 1940, representing the difference between $224,000.00, the amount owed by you in notes to the Estate of James Shewan, and $123,200.00, the amount paid the said estate as the purchase price of said notes is includible in your gross income under the provisions of section 22 (a) of the Internal Revenue Code. The Commissioner, in determining the deficiency, disallowed a deduction of $2,252.90 with the following explanation: The deduction of $63,019.72 for taxes included an item of $2,252.90 for real estate axes. On January 2, 1940 you acquired from the Estate of James Shewan the real estate and improvements located in the city of Oakland, California, previously occupied by *330 you under a lease from said estate. In April 1940, pursuant to the terms of the said lease, you paid an amount of $2,252.90 representing the April instalment of Alameda County taxes for the year ending June 30, 1940. The taxes became a liability of the estate on the first Monday of March, 1939. It is held that the amount of $2,262.90 represents an additional cost of the property and is not an allowable deduction under the provisions of section 23 of the Internal Revenue Code. Opinion MURDOCK, Judge: The first issue is whether the petitioner is entitled to use as a basis for loss upon the 1940 sale of four pieces of land, the cost of those lands as shown by its books or whether it must use some smaller amount as contended by the respondent. The petitioner acquired one of the properties on February 1, 1913 by issuing its bonds and stock in exchange for it. It acquired, in the same way and at the same time, all or a large part of the stock of the corporations owning the other three properties and shortly thereafter had the properties themselves transferred to it as set forth in the facts. The parties make no point of this difference in method of acquisition. *331 Their principal difference seems to be as to how much of the total cost of all properties acquired in 1913 should be allocated to the four parcels of land sold in 1940. The issue will be decided as narrowly as it has been presented. The petitioner, when it acquired the properties, placed costs of the separate properties on its books. Depreciation and loss deductions have been claimed and allowed on the basis of those book costs in many years since 1913. The Commissioner, in determining the deficiency for 1940, has cast aside the book costs upon which both parties have previously relied. He now makes no contention that his determination was correct but contends, instead, for a basis of about $30,000 in accordance with an opinion of 1913 value expressed by his witness. He also relies to a certain extent upon the book costs of the preceding owners. The question is to determine cost, not value, of the properties, and cost to the petitioner, not to any prior owner. The total cost of the properties acquired in 1913 was at least the amount shown on the petitioner's books and used in its computation herein. There is, and was in 1913, room for difference of opinion as to how the total cost *332 should be allocated to the separate assets acquired. It is not surprising that evidence is not readily attainable after a third of a century, but such evidence as has been presented fairly preponderates in favor of the contention of the petitioner that the cost of the properties sold in 1940 was at least $120,193.62. The petitioner owed the Shewan estate a debt of $224,000 at the beginning of the taxable year. That debt represented money which the petitioner had borrowed from the Shewan estate. The petitioner discharged and satisfied the debt during the taxable year by a payment of $123,200. It apparently reported the difference of $100,800 as income for the year. It now contends that it realized no taxable income from the transaction. It cites a number of cases but particularly relies upon Helvering v. American Dental Company, 318 U.S. 322; Shellabarger Grain Products Co., 2 T.C. 75, affirmed on this point 146 Fed. (2d) 177, and Liberty Mirror Works, 3 T.C. 1018. The respondent has tried unsuccessfully to distinguish those cases. It is not a distinction that the debt was for money borrowed since a similar debt was involved in *333 two of the cases cited above. The agreement pursuant to which the debt was satisfied also covered the sale by the creditor to the petitioner of a piece of real estate. The respondent points to that circumstance and seems to claim that it distinguishes the present case from those cited because the purchase of the property by the petitioner was some consideration for the cancellation of the debt by the creditor. It is not apparent how this circumstance aids the respondent. The taxpayer in the American Dental Company case signed a new lease with the creditor who cancelled a part of the past due rent on the old lease. The agreement in the Shellabarger case was that if the petitioner was allowed to satisfy one of its notes for less than the face amount thereof it would at the same time pay another note in full. The arrangement between the creditor and the debtor in the Liberty Mirror Works case was for the payment of a portion of the indebtedness, the extension of a portion thereof, and the cancellation of the balance. The benefits which the creditors obtained in the three cited cases are no different in principle from any which the creditor in the present case may have obtained. Furthermore, *334 the evidence indicates that the cold storage property was sold for just about what it was worth. However, it is difficult to see how the respondent's case would be any better if that property was sold for more than it was worth. The result in that case would be that the creditor in effect cancelled a smaller part of the debt than $100,800. Decision must be for the petitioner upon authority of the three cases cited above. The petitioner has stated in its brief that the third issue need not be decided if the first two issues are decided in its favor. Decision will be entered under Rule 50.